**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| A. ELIZABETH KRAFT, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: 5:21-CV-5430 |
| | : | |
| vs. | : | |
| | : | **JURY TRIAL DEMAND** |
| CITY OF READING and MAYOR EDDIE | : | |
| MORAN (in his individual capacity only) | : | |
| Defendants. | : | |

**ORDER**

**AND NOW**, this _____ day of _____, 2022 upon consideration of Defendants,

City of Reading and Mayor Eddie Moran's Motion for Summary Judgment and Memorandum of

Law in Support thereof, and any response(s) thereto, it is hereby **ORDERED** and **DECREED** that

Defendants' Motion for Summary Judgment is **GRANTED**.

Judgment is hereby entered in favor of Defendants and against Plaintiff, and all claims

asserted by Plaintiff against Defendants are hereby **DISMISSED WITH PREJUDICE.**

BY THE COURT:

_____

**J.**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| A. ELIZABETH KRAFT, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: 5:21-CV-5430 |
| | : | |
| vs. | : | |
| | : | **JURY TRIAL DEMAND** |
| CITY OF READING and MAYOR EDDIE | : | |
| MORAN (in his individual capacity only) | : | |
| Defendants. | : | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, City of Reading and Mayor Eddie Moran, by and through their counsel, Marshall Dennehey Warner Coleman and Goggin, respectfully move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), on the grounds that there is no evidence in this case upon which a jury could find in favor of Plaintiff on her claims against Defendants; Defendants are thereby entitled to judgment as a matter of law. In support thereof, Defendants submit the attached Memorandum of Law and Statement of Undisputed Facts, which are incorporated herein by reference.

Respectfully submitted,
**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**

Dated: October 24, 2022                    By:_____

JOHN P. GONZALES, ESQUIRE
Attorney ID No. 71265
2000 Market Street, Suite 2300
Philadelphia, PA 19103
P: (215) 575-2871/
F: (215) 575- 0856
E-mail: jpgonzales@mdwcg.com
*Attorney for Defendants, City of
Reading and Mayor Eddie Moran*

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| A. ELIZABETH KRAFT, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: 5:21-CV-5430 |
| | : | |
| vs. | : | |
| | : | **JURY TRIAL DEMAND** |
| CITY OF READING and MAYOR EDDIE | : | |
| MORAN (in his individual capacity only) | : | |
| Defendants. | : | |

**DEFENDANTS, CITY OF READING AND MAYOR EDDIE MORAN'S**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

I.        **INTRODUCTION**

On November 5, 2019, Eddie Moran was elected the City of Reading's 84th Mayor, and

the first Latino to be elected mayor in a Pennsylvania municipality with more than 85,000

residents. Mayor Moran started his term on January 6, 2020. Shortly after winning the election,

Mayor Moran formed a transition committee to facilitate the transition of the executive branch of

government in the City of Reading, and to bring together diverse view points and representation.

As part of his new team, Mayor Moran hired Plaintiff, A. Elizabeth Kraft, to serve as the

City Solicitor. Ms. Kraft had served in the City Solicitor's Office under prior administrations,

and Mayor Moran believed that her experience and knowledge would serve the law department

well.

Unfortunately, the City of Reading was faced with the COVID-19 pandemic in early

2020, which placed many challenges on city government. It became clear to Mayor Moran that

Ms. Kraft was simply not up to the challenge. Ms. Kraft appeared to be overwhelmed at times by

the work load and the stress it placed upon her family. Moreover, she allowed personal issues to

adversely affect her performance on the job.

Ms. Kraft was not performing tasks in a timely manner, and frequently was reduced to tears and emotional outbursts with other staff members in City Hall. These outbursts created a difficult working environment and undermined the trust Mayor Moran had placed in her. Although the Mayor was very patient with Ms. Kraft, and tried to support her, Ms. Kraft's performance and behavior did not improve and, if anything, became more erratic and confrontational. Ultimately, the Mayor lost faith in Ms. Kraft's ability to perform the job and, more importantly, lost trust in her judgment and her ability to deliver competent legal advice.

Ultimately, the Mayor decided to terminate Ms. Kraft after giving her several months to improve her performance, and her behavior.

Plaintiff brought claims against Defendants City of Reading and Mayor Eddie Moran, alleging discrimination, based on alleged disparate treatment, hostile work environment, retaliation and *quid pro quo* harassment, and retaliation under the Pennsylvania Whistleblower Law.

However, Plaintiff failed to adduce sufficient evidence to support her claims, as the following sections of this brief will demonstrate.  Therefore, Plaintiff's claims fail as a matter of law and judgment should be entered against Plaintiff and in Defendant's favor on all Plaintiff's claims.

Mayor Moran categorically denies the baseless allegations she has lodged against him of inappropriate sexual behavior or comments. At no time did Mayor Moran engage in the behaviors set forth in the Amended Complaint. At no time was she subjected to sexual discrimination, *quid pro quo* sexual harassment or retaliation. The Mayor never invited any sexual contact with Ms. Kraft and certainly did not condition her continued employment with the

City upon any requests for sexual favors. Significantly, although the City has in place a robust sexual harassment and discrimination policy, Ms. Kraft never reported any discrimination complaints to Human Resources or any other City agency or official until **after** she was terminated.  It appears that Plaintiff's allegations were designed to threaten and embarrass Mayor Moran and his family.  Should the Court deny this Motion, Mayor Moran looks forward to the opportunity to refute Plaintiff's baseless allegations in a Court of Law before a jury of his peers.

Nevertheless, Defendants recognize that the standard of review this Court must employ will view the allegations in the light favorable to Plaintiff.  To the extent those allegations are treated as factual in this pleading, they are merely assumed so for the sake of the argument and, should this motion be denied, Plaintiff will be required to prove each allegation in her Amended Complaint at trial.

## II.      FACTUAL BACKGROUND

Defendants incorporate by reference their accompanying Statement of Undisputed Facts as if same were set forth fully herein at length.

## III.      LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, Answers to Interrogatories, and admissions, together with the affidavits, if any, show that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When determining a motion for summary judgment, the court views the facts and draws all reasonable inferences in favor of the non-moving party. *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 180 (3d Cir. 1999). The moving party bears the initial burden of showing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. *Taylor v. Phoenixville Sch. Dist.*, 113 F.Supp.2d 770, 773 (E.D. Pa. Sept. 19, 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (hereinafter "*Taylor II*").

When the moving party has carried its burden under Federal Rule of Civil Procedure 56(c), it's opponent must show specific facts demonstrating a genuine issue of material fact that amounts to more than some metaphysical doubt. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A non-moving party who merely relies on "unsupported assertions, conclusory allegations or mere suspicions" does not demonstrate a genuine issue for trial. *Taylor II*, 113 F.Supp.2d at 773 (relying on *Anderson*, 477 U.S. at 249). Furthermore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007).

A moving party is entitled to judgment as a matter of law "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The non-moving party's showing must be supported by concrete evidence in the record. *Id.* at 322–23. "If the evidence is merely colorable, . . . or is not significantly probative, . . .summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. St. Gobain Corp.*, 323 F.Supp. 2d 637, 642 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson and Co.*, 554 F.2d 566, 573 (3d Cir. 1976)).

No reasonable jury could conclude that Plaintiff suffered, discrimination, a hostile work environment, or retaliation by the Defendants based on her gender; therefore, Plaintiff's claims fail as a matter of law and judgment must be granted in Defendants' favor.

## IV.     <u>LEGAL ARGUMENT</u>

### A)     *PLAINTIFF FAILED TO ESTABLISH A DISCRIMINATION CLAIM;*

### THEREFORE, PLAINTIFF'S DISCRIMINATION CLAIMS MUST BE DISMISSED.

Title VII makes it unlawful for an employer to discriminate against an individual with respect to her employment on the basis of the individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). A plaintiff may establish a claim of discrimination for harassment based on her sex or race "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive" as to create an "objectively hostile or abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Savings Bank, FSB v. Vinso*n, 477 U.S. 57, 65, 67 (1986)) (internal citations and quotations omitted).

It is well established in the Third Circuit that claims brought under the PHRA are analyzed under the same analytical framework as claims brought under Title VII.[1] *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317 (3d Cir. 2000). Similarly, Third Circuit courts have continuously analyzed Section 1981 claims using the same legal standards as those for Title VII claims.[2] *See, e.g.*, *Bullock v. Children's Hospital of Phila.*, 71 F.Supp.2d 482, 485 (E.D. Pa. 1999); *Mason v. Ass'n for Independent Growth*, 817 F.Supp. 550 (E.D. Pa. 1993); *see also Johnson v. St. Luke's Hosp.*, No. 06-3417, 2007 WL 3119845, at *4 (E.D. Pa. 2007) (reasoning that Title VII and Section 1981 claims are analyzed under the same legal standard because one statute's protection is co-extensive with the other's). Therefore, Defendants address all claims simultaneously.

### 1) Plaintiff's Hostile Work Environment Claim Fails as a

---

[1] In Pennsylvania, the right to a remedy for discrimination in employment is established by the PHRA, where it is provided, "the opportunity for an individual to obtain employment for which he is qualified ... without discrimination because of race . . . [or] sex . . . is hereby recognized as and declared to be a civil right which shall be enforceable as set forth in this act." 43 P.S. § 953.

[2] Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens ..." 42 U.S.C. § 1981.

_Matter of Law._

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] ... because of ... sex.'" _Oncale v. Sundowner Offshore Servs, Inc._, 523 U.S. 75, 81 (1998). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." _Id._ at 80 (quoting _Harris v. Forklift Systems, Inc._, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).

It is well-established that a plaintiff seeking to establish a hostile work environment claim must demonstrate "by the totality of the circumstances", the existence of a hostile or abusive environment, or "an environment that a reasonable person would find hostile or abusive." _Harris_, 510 U.S. at 21. Specifically, a plaintiff must show that: (1) she suffered intentional discrimination because of her protected classification; (2) the discrimination was pervasive or regular; (3) the discrimination detrimentally affected plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same protected category as plaintiff; and (5) respondeat superior liability existed. _Mandel v. M&Q Packaging Corp._, 706 F.3d 157, 167 (3d Cir. 2013); _Rose v. Woolworth Corp._, 137 F. Supp. 2d 604, 610 (E.D. Pa. 2001).

Plaintiff failed to establish a hostile work environment claim or sex discrimination claim as a matter of law. Plaintiff's testimony concerning the actions which she alleges constitute the discriminatory conduct failed to demonstrate an environment which a reasonable person would find hostile or abusive. Further, she failed to demonstrate pervasive or regular discrimination, or that the complained-of conduct would detrimentally affect a reasonable person in the same protected category as Plaintiff.

As detailed in the statement of facts, Plaintiff's allegations in this case assert that she was

repeatedly told to smile by the Mayor; that she was asked what the nature of her relationship was with Mr. Nathan Matz; that she was repeatedly told by the Mayor that she "looks nice" and is an "attractive woman" and that her shoes were nice and therefore felt "objectified" by the Mayor. She claimed that on more than one occasion, the Mayor hugged her, and she further asserted that he invited her to go to Puerto Rico with him, to visit his home and to live in his finished basement, and that he repeatedly stated that if there was anything he could do, she only had to ask.

She alleged that, as a result, he refused to meet with her one-on-one, as she requested; that she was no longer invited to be part of the COVID-19 Emergency Response Team; and was required to get approval before meeting with top staffers and department directors. (Ex. A, at ¶¶29-33) She alleged that the hostility later resulted in her being terminated. (Id.)

However, Plaintiff's testimony did not support many of the allegations in her Amended Complaint. Even when viewed in the light most favorable to the Plaintiff, however, a reasonable person would not find the alleged acts of discrimination to have been detrimental.[3]

As for the statements Plaintiff alleges the Mayor made, the law is clear that gender-based remarks "do not inevitably prove that gender played a part in a particular employment decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Rather, to determine the probative value of employer remarks, courts examine the circumstances in which the statements were made, including: "(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement." *Mammen v. Thomas Jefferson Univ.*, 523 F. Supp. 3d 702, 722 (E.D. Pa. 2021) These factors must be considered *in*

---

[3] Defendants use the term "facts" even though they contest the truth or accuracy of Plaintiff's allegations. However, for purposes of this Motion, the facts must be viewed in the light most favorable to the Plaintiff, and any dispute must be resolved in favor of Plaintiff.

*toto* in light of the nature and context in which the comment was made.

Here, while the statements were allegedly made by Plaintiff's boss, Mayor Moran, there was no temporal proximity of note between these alleged statements and any alleged adverse employment action. Furthermore, the purpose and content of the statements did not appear to have any discriminatory animus of note, and appear to be nothing more than well-intentioned friendly compliments.

With regard to the allegation that she was asked to smile by the Mayor, while Plaintiff may have found that to be condescending or unprofessional, it does not amount to an action which should have detrimentally affected her, especially given that she never told that Mayor that it made her feel uncomfortable or asked for him to stop

Similarly, the occasional compliments—that Plaintiff looked "nice" or referring to himself being in a car with a "beautiful" woman—were neither pervasive nor the kind of matter which would have been found to affect a reasonable person and would not alter the terms and conditions of her employment. The same is true of the discussions allegedly inviting Plaintiff to vacation in Puerto Rico or to come live in the Mayor's basement when the municipal-residency requirement threatened to be an issue for her. Neither of those instances, when Plaintiff's testimony is read in full, demonstrates any sex-based adversity or discriminatory effect, such that a reasonable person would find they were based in any way on her status as a woman. The same is true of the conversation whereby the Mayor allegedly stated that if she had any problems to come to him. *See, Munoz v. World Flavors, Inc.*, 805 Fed. Appx. 90, 93 (3d Cir. 2020) (The alleged isolated incidents of harassment – defendant brushing plaintiff's shoulder, flirting with plaintiff, expression that defendant found plaintiff attractive and asking to see plaintiff's tattoos, were deemed "highly offensive" but "insufficient for a reasonable juror to find that Munoz suffered discrimination that

was severe or pervasive.)

While Plaintiff unreasonably read into that a demand for sexual favors which simply did not exist and could not be seen to exist by a reasonable person[4], her subjective inference, generated without basis in fact, is insufficient to establish a viable cause of action.

Finally, Plaintiff points to the fact that the Mayor allegedly repeatedly asked her for hugs. However, it should be noted that when asked if she ever saw the Mayor hug anyone else, she replied that the Mayor hugged other men in the office, and that while she did not see him hug any other women other than his wife, she conceded that the office was mostly men.  (Ex. E, at 112:14-113:17)  She further testified that there were other occasions where she hugged other people in the office, including friends.  (Ex. E, at 216:22-217:7) Pedro Cortes, the former managing director for the City of Reading confirmed that hugging was a cultural convention for the Mayor and many members of the staff.  (Ex. F, at 57:22-59:2)

As demonstrated by Plaintiff's own testimony, this was a situation where hugging was not something specifically directed toward Plaintiff, but was a general office practice, without regard for the gender of the person being hugged and cannot support a claim as a matter of law.

Title VII, and related statutes protecting employees from discrimination, do not prohibit "all verbal or physical harassment in the workplace[.]" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (quoting *Oncale v. Sundowner Offshore Servs, Inc.*, 523 U.S. 75, 81 (1998)). "Only harassment ***motivated by a discriminatory animus*** is prohibited." *Friel v. Mnuchin*, 474 F.Supp.3d 673, 692 (E.D. Pa. 2020) (citing *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001)) (emphasis added). In other words, Plaintiff must show that harassment must be linked to discrimination, in this case based on Plaintiff's gender.

---

[4] The allegations that these were *quid pro quo* demands will be dealt with below.

Accordingly, to prove impermissible workplace harassment, Plaintiff must show that her gender was a substantial factor in the harassment, and that if Plaintiff had been a male, she would not have been treated in the same manner. *See Ogden v. Keystone Residence*, 226 F.Supp.2d 588, 598 (M.D. Pa. 2002) (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996)). The behavior or specific words allegedly constituting harassment are not relevant in and of themselves, rather they are only relevant for what they can reveal—the intent of the speaker. *Id.*

"Obviously, an employer who discriminates against everyone discriminates against no one." *Steinberg v. St. Regis*, 583 F.Supp. 421, 424 (S.D. NY 1984). As such, "mistreatment and disrespect unmotivated by the plaintiff's [statutorily-protected trait] does not create a hostile work environment." *Hubbell v. World Kitchen, LLC*, 688 F.Supp.2d 401, 420 (W.D. Pa. 2010) (quoting *Koschoff v. Henderson*, 109 F.Supp.2d 332, 346 (E.D. Pa. 2000)).

The Supreme Court has asserted: "[w]e have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80. Therefore, "equal opportunity offenders" who create "an uncouth, unprofessional, and offensive workplace...for all...regardless of the employees' protected traits do not establish an actionable work environment." *Betz v. Temple Health Sys.*, No. 15-00727, 2015 WL 4713661, at *4 (E.D. Pa. 2015) (relying on *Oncale*, 523 U.S. at 80).

In this case, Plaintiff's testimony is clear that Mayor Moran did not limit his hugs to Plaintiff, but were given to other members of the staff, including other men in the office. Defendants deny that this behavior was offensive, unprofessional or uncouth.  However, under the law, even if one found the hugs to be unprofessional, they are insufficient to support a claim

of hostile work environment sexual harassment as a matter of law.

Plaintiff failed to adduce sufficient evidence of intentional discrimination as required to establish a hostile work environment claim. Therefore, Plaintiff's hostile work environment claim must be dismissed as a matter of law.

### 2)  Plaintiff's Disparate Treatment Claim Fails as a Matter of Law.

A plaintiff's disparate treatment claim is analyzed under the *McDonnell-Douglas* burden shifting framework. *See Sherrod v. Phila. Gas Works,* 57 Fed. Appx. 68, 73 (3d Cir. 2003). The plaintiff carries the initial burden of establishing a prima facie disparate treatment claim. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff succeeds, the employer then has the burden of production to show a "legitimate, non-discriminatory reason" for the plaintiff's termination. *Id.* Finally, if the employer meets the relatively light burden of demonstrating a legitimate non-discriminatory reason for the termination, the plaintiff must prove by a preponderance of the evidence that the employer's articulated reasons are pretext for discrimination. *Id.*; *Billet v. CIGNA Corp.*, 940 F.2d 812, 816 (3d Cir. 1991). Despite the burden shifting *McDonnell Douglas* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

To establish a prima facie case of discriminatory discharge, a plaintiff must show that she: (1) is a member of a protected class; (2) was qualified for the position; and (3) was discharged under circumstances that give rise to an inference of unlawful discrimination. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 354 (3d Cir. 1999) (*quoting O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (internal quotations, brackets and emphasis omitted)). The last element focuses on whether the employer treated individuals less favorable than others

because of their gender. *Pivirotto*, 191 F.3d at 352. At the prima facie stage, the "central focus" is on whether an employer has treated an employee less favorably than others on the basis of an illicit discriminatory criterion. *Howard v. Blalock Elec. Serv., Inc.*, 742 F. Supp. 2d 681, 701–02 (W.D. Pa. 2010).

In this case, however, Plaintiff cannot establish a disparate treatment claim as a matter of law, because there are no identical comparators.  While Plaintiff might suggest that other managers who were male might constitute comparators, and that the fact that Plaintiff was unable to meet with Mayor Moran alone, as she wanted; was removed from the COVID-19 Emergency Response Team; and was required to get approval before meeting with top staffers and department directors demonstrates the disparate impact.

However, for comparator evidence to suffice to demonstrate disparate impact, the comparators must be identical "in all relevant respects." *Williams v. Fed. Express Corp.*, CV 20-5527-KSM, 2022 WL 1265529, at *4 (E.D. Pa. Apr. 28, 2022), citing *Durst v. City of Philadelphia*, 798 F. App'x 710, 713 (3d Cir. 2020). None of the other staffers or department directors had this loyalty to both the Mayor and the council and, as such, it is to be expected that she would be treated differently.

Furthermore, none of the allegations of adverse employment action, save for the termination, sufficed to alter the terms and conditions of her employment. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 194 (3d Cir. 2015) (No viable claim where the terms and conditions of employment were not affected.)

Thus, Plaintiff is unable to establish that she was terminated or that her treatment by Mayor Moran were circumstances that give rise to an inference of discrimination based on her gender, because there are no valid comparators here and the terms of her employment were not altered.

Finally, Plaintiff was terminated for a legitimate non-discriminatory reason, namely her performance and behavior failing to meet the expectations of Mayor Moran, her failure to complete assignments on time, and her difficulty in maintaining productive and cooperative relationships with the Mayor, her colleagues and managing directors.

Plaintiff failed to adduce sufficient facts to establish a prima facie claim for disparate treatment based on her race or gender; therefore, Plaintiff's disparate treatment claim must be dismissed as a matter of law.

### 3)  Plaintiff's Quid Pro Quo Claim Fails as a Matter of Law.

Next, Plaintiff's *quid pro quo* claim fails as a matter of law.  A claim alleging *quid pro quo* sexual harassment must demonstrate that the defendant made unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, and that the plaintiff was explicitly or implicitly required to submit to such conduct as a term or condition of employment or where submission to or rejection of such overt sexual conduct forms the basis of employment decisions.  *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 27 (3d Cir. 1997)(*quoting Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296 (3d Cir.1997)).

Further, the consequences must be sufficiently severe to alter the "compensation, terms, conditions, or privileges of employment." *Robinson*, 120 F.3d at 1296–97. Moreover, the *sine qua non* of the theory is the exchange of sexual favors for benefits. Absent an explicit or implicit demand for that exchange, there is no viable *quid pro quo* theory. Bonenberger, 132 F.3d at 28 ("In this case, there is no *quo* for the alleged *quid* of enduring the hostile work environment. As noted above, *quid pro quo* harassment requires a direct conditioning of job benefits upon an employee's submitting to sexual blackmail, or the consideration of sexual criteria in work evaluations.")

In this case, Plaintiff failed to identify any "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" nor was there anything conditioning "submission to such conduct that was made either explicitly or implicitly a term or condition of an individual's employment" or "used as the basis for [an] employment decision[]."

Nowhere in the testimony about Puerto Rico or living in the Mayor's basement is there any allegation sufficient to establish the "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" which is required for this cause of action. Nor was there any explicit or implicit statement that such sexual favors were being demanded in exchange for any employment benefit.

At most, Plaintiff herself drew an improper and unreasonable inference and, subjectively believed that if she offered herself sexually that the Mayor would accept that offer. (Ex. E, 132:17-18, "I think if I said how about tonight, let me come over, I don't think he would have declined.")  However, a *quid pro quo* claim is simply not established by the plaintiff speculating that the defendant would be willing to engage sexually with the plaintiff if the plaintiff were to offer to do so. Rather, there must be a demand by the defendant which the plaintiff is pressured to accept. That simply does not exist under any reasonable view of the discussion about visiting Puerto Rico and Plaintiff living in the Mayor's basement, as she testified to those conversations in her deposition.

While she may have found the conversation to be odd or unprofessional, no reasonable person could view the conversation as demanding sexual favors. As such Plaintiff failed to establish a *quid pro quo* claim.

Finally, with regard to the repeated statement that she could come to him if she needed help, as with the previous incident, there is simply nothing which could constitute an

14

"[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" nor was there anything conditioning "submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment" or "used as the basis for [an] employment decision[]."  Rather, all that occurred here was Mayor Moran offering to assist Plaintiff should she need it, followed by the Plaintiff leaping to the unwarranted conclusion that the offer was contingent upon the offering of sexual favors—something which Plaintiff created from whole cloth and which is not supported by the evidence, either directly or through any reasonable inference.

As Plaintiff failed to demonstrate the direct conditioning of the benefits of her employment on her providing sexual favors or that any explicit or implicit demand for sexual favors was even made, she failed to prove a *quid pro quo* claim as a matter of law and summary judgment is proper on that theory.

### B) PLAINTIFF FAILED TO ESTABLISH A RETALIATION CLAIM UNDER TITLE VII; THEREFORE, PLAINTIFF'S RETALIATION CLAIMS MUST BE DISMISSED.

Title VII's anti-retaliation provision provides: "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

To establish a retaliation claim, a plaintiff must show that her protected activity was the "but-for" cause of the alleged adverse action by the employer. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013). The Supreme Court held that "[t]his requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful

action or actions of the employer." *Id.* While a plaintiff does not need to establish an underlying discrimination claim, the plaintiff must show that he engaged in protected activity "under a good faith, reasonable belief that a violation existed." *Moore v. City of Philadelphia,* 461 F.3d 331, 344 (3d Cir. 2006) (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996)). This standard requires an "objectively reasonable belief" that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008) (quoting *Moore*, 461 F.3d at 341).

Plaintiff failed to adduce sufficient facts to establish a retaliation claim as a matter of law. Plaintiff failed to bring forth any facts that she engaged in protected activity or that any alleged protected activity was the "but-for" cause of her termination.

In addition, Defendants have a legitimate, non-discriminatory reason for terminating Plaintiff.  Specifically, it was Plaintiff's difficulties in establishing and maintaining productive and harmonious working relationships with the Mayor and the city's directors that led to her termination.  Therefore, retaliation simply could not be the but-for cause of Plaintiff's discharge. *See,* (Termination Letter, at Ex. B; Answer to Interrogatory #1, at Ex. H)

Plaintiff failed to establish a prima facie retaliation claim. Accordingly, Plaintiff's retaliation claims must be dismissed as a matter of law.

**C)** **PLAINTIFF'S CLAIM UNDER THE PENNSYLVANIA WHISTLEBLOWER LAW MUST BE DISMISSED.**

Under the Pennsylvania Whistleblower Law, an employer may not discharge an employee if he or she "makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act."  43 Pa. C.S.A §1423(a).

The Pennsylvania Whistleblower Law provides the following pertinent definitions:

"WASTE." An employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources.

\* \* \*

"WRONGDOING." A violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer.

43 P.S. § 1422.

Plaintiff, in her Amended Complaint, asserted that the whistleblower claims raised in the September 28, 2020 letter asserted "waste" and "wrongdoing."

To assert a cause of action for retaliatory discharge under the Whistleblower Law, the plaintiff must allege both a protected report of wrongdoing or waste and a causal connection between that report and the discharge. *Evans v. Thomas Jefferson University*, 81 A.3d 1062, 1064 (Pa. Commw. 2013) (citations omitted).

Furthermore, to establish a whistleblower claim, a report must specify how an employer is guilty of wrongdoing or waste. *Sukenik v. Twp. of Elizabeth*, 131 A.3d 550, 555-56 (Pa. Commw. Ct. 2016); *Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commw. 1994), aff'd, 669 A.2d 335 (1995).

### A) No Viable Claim Is Present

Summary Judgment is appropriate on Pennsylvania's Whistleblower Law claim as Plaintiff failed to comply with the requirements of the law. In order to make a prima facie case based on an alleged report of wrongdoing, Plaintiff must point to verbal or written reports she made of Defendant's violation of an identifiable statute, regulation, ordinance, or code of conduct or ethics. 42 Pa. Cons. Stat. §§ 1422 and 1424(b).

An overly "general and vague" allegation of wrongdoing is not enough to state a claim.

*Frazier v. City of Philadelphia*, 441 F. Supp. 3d 76, 96 (E.D. Pa. 2020); *Sukenik v. Twp. of Elizabeth*, 131 A.3d 550, 555-56 (Pa. Commw. Ct. 2016) ("The report [of wrongdoing] must provide information that is sufficient to identify the law allegedly violated; reports of vague or subjectively wrong conduct are not considered wrongdoing under the [Pennsylvania] Whistleblower Law.") (internal citation omitted); *see also Riggio v. Burns*, 711 A.2d 497 (Pa. Super. Ct. 1998)  Thus, "the Court must determine whether the substance of [the whistleblower's] complaints alleged a violation of a specific legal or ethical authority." *McAndrew v. Bucks Cty. Bd. of Comm'rs*, 183 F. Supp. 3d 713, 743 (E.D. Pa. 2016).

Taking each allegation in turn, it is clear that Plaintiff's September 28, 2020 letter failed to meet the standards needed to assert a clam under the aforementioned law.  It was simply little more than a laundry list about things in the office of which Plaintiff had a "concern." Interestingly, however, despite serving as the Chief Legal Officer for the City of Reading, she offered no opinions, recommendations or solutions to any of the items in her letter lending support to the contention that this was nothing more than a veiled effort to protect herself from her inevitable termination by vainly trying to claim that she engaged in protected activity.

In the instant Amended Complaint, Plaintiff asserts that she "reported to Moran instances of ghost employees, i.e., no-show employees and employees not working full workweeks for which they were paid."  However, in the September 28, 2020 letter, Plaintiff merely stated,

> Equal application of the City's 35-hour work week is in the best interest of City, ensures accountability, and respects all the City employees who show up to work every day no matter their circumstances. Therefore, I am advising that personnel policies be equally, fairly, and consistently applied to all City employees, **if** they are not already being so applied.

(Ex., G, )  Here, Plaintiff is not, on the face of the letter reporting a violation of a specific legal or

ethical authority.  Rather, Plaintiff is advising that "if" personnel policies were not being properly applied, that they should be.  As it turned out, however, Plaintiff was referring to employees who were working from home during the height of the COVID-19 pandemic that she suspected were not actually working, but for which she had no credible evidence or information to support.

Second, in the Amended Complaint, Plaintiff alleges that she "cautioned Moran about his usage of his city car for personal purposes, such as driving to New York to see family and friends." (Ex. A, at ¶59)  However, in her September 28, 2020 letter, she merely stated that one of her "concerns" was "[u]se of the Mayor's city vehicle." (Ex. G, at p.2)  Nothing in that September 28, 2020 letter is sufficient to meet the standard required for the Pennsylvania Whistleblower Law because it fails to identify any information as to what law was allegedly violated and, indeed, does not even amount to a vague assertion of wrongful conduct. She does not even state that she was concerned that the Mayor's vehicle was being "misused." She merely states that she was concerned by its "use."  Indeed, Mr. Cortes testified that the complaints he knew about concerning the Mayor's vehicle were limited to where it was parked.  (Ex. F., at 67:17-62:6)

Next, Plaintiff alleged that she cautioned the Mayor about "city funds being paid to outside contractors for work they were not doing." (Ex. A, at 60)  However, in the September 28, 2020 letter, Plaintiff made no complaint about contractors being paid without doing work. Instead she simply raised a concern that "[i]nvoices for services provided to the Mayor's office submitted without the proper documentation to support the charges listed. Several months have passed since requesting this documentation and repeated reminding, to no avail." (Ex. G, at p.2)

Here, the allegations in the September 28, 2020 letter did not aver any wrongful conduct,

but simply noted that invoices were submitted without proper documentation, not that the work for those invoices was not being done, as Plaintiff later alleged in the Amended Complaint.

Further, the two instances which Plaintiff identified in the Amended Complaint involved a payment of $5,000 each, one to a film company, allegedly for contracted work that "had not been done"; and one to a speechwriter who was a political ally of the Mayor.  (Ex. A, at ¶¶61-62)

As for the first, in her deposition, Plaintiff conceded that the film company had, in fact, done the work for the city. (Ex. E., at 147:1-9; 149:7-17) Specifically, the contractor produced a 30 second video as well as additional videos. (Id.) So, as even Plaintiff admitted in her deposition, the allegations in the Amended Complaint are without factual basis on that point.

Similarly the second allegation concerned State Representative Manny Guzman. Plaintiff testified that the invoice was not sufficiently detailed to support the amount he charged for communications services performed on behalf of the City before he was elected to the State House.  Plaintiff believed that Mr. Guzman was to set up a Facebook page but the charge was for speech writing and social media content. (Ex. E., at 150:19-22; 151:9-11; 152:8-10) While the Facebook page was not set up, Plaintiff conceded that Mr. Guzman "may have written [some of] the speeches" at issue. (Ex. E, at 152:8-10) Consequently this claim is essentially unsupported.

Next, Plaintiff asserts in the Amended Complaint that she "cautioned Moran about his usage of city credit cards, and of usage by Moran's top aides." (Ex. A, at ¶63)  However, the September 28, 2020 letter on this point is as vague as was the allegation regarding the use of the Mayor's vehicle. In her letter, Plaintiff did not make any assertion that the credit card was being misused in any way. She merely raised a concern about the "[u]se of City credit card assigned to the Mayor." (Ex. G, at p.2) This assertion is insufficient to support a claim under the Pennsylvania whistleblower law as a matter of law.

Furthermore, in her deposition, Plaintiff merely stated that the concern was that "Nate [Rivera, Assistant to the Mayor] had lost the credit card..." (Ex. E, at 180:19-24) She also indicated that the Director of Finance spoke to her about "concerns about the food that they were purchasing on a regular basis." (Id., at 12-13) Nothing in these allegations are sufficient to assert, as a plaintiff must under the Pennsylvania Whistleblower Law that some identifiable statute, regulation, ordinance, or code of conduct was in fact being violated. There is no allegation, for example, that the credit card was being misused or that what was being purchased was not for proper city use. Consequently, the claim cannot be sustained.

Finally, in the Amended Complaint Plaintiff alleged that she reported:

> [T]hat members of the city's fire and police departments, and other high-ranking administration officials, were improperly exerting pressure on city officials to approve Heart and Lung Act benefits in particular cases. Such approvals, if improperly issued, could have wrongfully drained millions of taxpayer dollars from the city's self-insurance reserves. Improper pressure was also being exerted to accept certain Workers' Compensation claims that were previously denied as non-compensable.

(Ex. A, at ¶64)  In her September 28, 2020 letter she wrote of concerns about "[m]eddling of Mayor's office staff in ongoing legal matters where there is counsel already assigned and potentially exposing the City to unnecessary liability." In her deposition, Plaintiff asserted that this passage was intended to address the Heart and Lung Act issue. (Ex. G, at p.2)

These averments are insufficient under the Pennsylvania Whistleblower Law. The passage in the September 28, 2020 letter is too vague to satisfy the law's requirements and it further fails to identify any identifiable statute, regulation, ordinance, or code of conduct or ethics which is allegedly being violated.

Furthermore, when asked about this in her deposition, Plaintiff stated that the actions taken were as follows:

21

> [O]nce the city had denied Heart and Lung benefits, Nate Rivera was close with police and fire. Members of police and fire union would go to Nate Rivera and say the city denied the Heart and Lung. And then either Nate Rivera or other members of the unions would go up to the Risk and Safety office and try to convince them to reverse a decision that had already been made to deny the Heart and Lung benefits.

(Ex. E, at 187:6-14) Nowhere in Plaintiff's discussion of this issue does she support the notion that any identifiable statute, regulation, ordinance, or code of conduct or ethics was being violated by the personnel who were seeking to have the Heart and Lung benefit decision reversed. For all the record shows, the Heart and Lung Act claimants were entitled to benefits and were wrongly denied and were merely seeking to have that denial reconsidered. Plaintiff's concerns on this issue, as expressed in the September 28, 2020 letter, are not sufficient to assert a viable cause of action.

Finally, in order for the Whistleblower Law claim to be actionable, there must be a causal connection between the act of whistleblowing and the ultimate termination.  In this case, Plaintiff's letter was sent on September 28, 2020.  However, Plaintiff was not terminated from her employment until February 23, 2021, nearly five months later.  Since her tenure under Mayor Moran as City Solicitor lasted from May 2020 to February 2021, a period of nine months, the five-month period between sending the September 28, 2020 letter and her termination constitutes more than half her total time being employed in the position, so there is simply nothing indicating a causal connection between them.

Although Plaintiff will claim that the Mayor had made up his mind to terminate Plaintiff sometime in late November or early December, still more than 30 days had elapsed between the allegedly protected activity and the decision to terminate which constitutes insufficient temporal proximity to support causation as a matter of law.

As such, Plaintiff failed to establish a prima facie retaliation claim under the Pennsylvania Whistleblower Law, and Plaintiff's retaliation claims must be dismissed as a matter of law.

**V.**        **CONCLUSION**

Based upon the aforementioned reasons, the Court should grant Defendants, City of Reading and Mayor Eddie Moran's Motion for Summary Judgment, enter judgment in favor of Defendants on all counts, and dismiss any and all claims against the Defendants, with prejudice.

Respectfully submitted,

**MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN**

Dated:  October 24, 2022              By:_____

JOHN P. GONZALES, ESQUIRE
Attorney ID No. 71265
2000 Market Street, Suite 2300
Philadelphia, PA 19103
P: (215) 575-2871/
F: (215) 575- 0856
E-mail:  jpgonzales@mdwcg.com
*Attorney for Defendants, City of*
*Reading and Mayor Eddie Moran*

23

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| A. ELIZABETH KRAFT, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: 5:21-CV-5430 |
| | : | |
| vs. | : | |
| | : | **JURY TRIAL DEMAND** |
| CITY OF READING and MAYOR EDDIE | : | |
| MORAN (in his individual capacity only) | : | |
| Defendants. | : | |

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants City of Reading and Mayor Eddie Moran ("Defendants"), by and through their undersigned counsel, respectfully submit this Statement of Undisputed Facts in Support of their Motion for Summary Judgment.

### I.    Plaintiff's Employment

1.    In 2018, Plaintiff was a licensed attorney in the Commonwealth of Pennsylvania when she was hired as an assistant city solicitor for Defendant City of Reading.  (Amended Complaint, Ex. A, at ¶¶8-9)

2.    On November 5, 2019, Eddie Moran was elected the City of Reading's 84th Mayor, and started his term on January 6, 2020.  (Id., at ¶1,4)

3.    On May 11, 2020, Plaintiff was unanimously confirmed as City Solicitor for the City of Reading.  (Id., at ¶10)

4.    Plaintiff worked through an eventful term of office until, on February 23, 2021, Plaintiff was terminated from her position after she experienced difficulties in establishing and

maintaining productive and harmonious working relationships with the Mayor and the city's directors.  (Termination letter, Ex. B)

5.      Plaintiff commenced suit by filing a writ of summons and later a Complaint, against Defendants in the Court of Common Pleas of Berks County, Pennsylvania.  (Complaint, Ex. C)

6.      Specifically, Plaintiff filed a four-count Complaint alleging federal violations and violation of the Pennsylvania Whistleblower Law.  (Id.)

7.      On December 13, 2021, the case was removed to this Court.  [ECF No. 1]

8.      Plaintiff filed an Amended Complaint on February 3, 2022, and again on August 12, 2022.  (Ex. A; Second Amended Complaint, Ex. D)

9.      The Amended Complaint asserts a total of six causes of action, asserting various sexual harassment allegations under, inter alia, 42 U.S.C. § 1983 and Title VII, the PHRA, as well as claims under the Pennsylvania Whistleblower Law.  (Ex. A, at ¶¶14-74; Ex. D, at ¶¶75-83)

10.     The allegations in the Amended Complaint assert that Plaintiff was repeatedly told to smile by the Mayor; that she was asked what the nature of her relationship was with the director of the parking authority; that she was repeatedly told by the Mayor that she "looks nice" and is an "attractive woman" and that her shoes were nice and therefore felt "objectified" by the Mayor. She claimed that on more than one occasion, the Mayor hugged her, and she further asserted that he invited her to go to Puerto Rico with him, to visit his home and to live in his finished basement, and that he repeatedly stated that if there was anything he could do, she only had to ask.  (Ex. A ¶¶14-32)

11.     As for the request to smile, Plaintiff testified:

Q.      Okay. Did the mayor ask anyone else to smile in your presence?

A.      Never.

Q.      How many times did he ask you to smile?

A.      Many. I don't have a number.

(Plaintiff's Deposition, Ex. E, at 90:12-17.)

Q.      You never heard or saw the mayor ask anyone else to smile. Is that correct?

A.      No, and certainly not other directors, no.

(Ex. E, at 91:2-5.)

12.     She further highlighted an alleged instance:

Q.      How did the meeting end?

A.      The meeting ended with the mayor standing up and making me pull down my mask and smile for him.

(Ex. E, at 100:14-17

13.     Plaintiff alleged that she was asked what the nature of her relationship was with

Mr. Nathan Matz, executive director at the parking authority.  She testified:

Then I received a phone call, it was either March or April, from Pedro that really hit me hard because I respect Pedro. I don't always agree with him, but I respect him very much. He's a very hard-working and excellent public servant. So I was surprised I was getting a phone call like this from him.

He was asking me about my relationship with Nathan Matz who is the executive director at the parking authority. He stated that they didn't have -- they couldn't trust me or didn't have confidence in me because I have a relationship with Nathan Matz. I took it to mean they thought that I had a personal sexual relationship and that rumor would later spread throughout city hall.

(Ex. E, at 43:20-44:9)[1]

14.     Plaintiff alleged that she was repeatedly told by the Mayor that she "looks nice"

and is an "attractive woman" and that her shoes were nice and therefore felt "objectified" by the

Mayor.  She testified:

> Q.     How many times did the mayor tell you that you were
>         beautiful or you looked beautiful?
>
> A.     Well, specifically beautiful, that occurred in his car. We
>        had --
>
> Q.     Right now I'm asking you for a number. I'll give you a
>        chance to tell your story or your attorney will. Right now is
>        a very specific question. How many times did the mayor
>        tell you that you looked beautiful?
>
> A.     Definitely in the car and there were several other times in
>        person. If it wasn't beautiful, it was you look great today,
>        you look so nice. He would always say it respectfully, but
>        then objectify me and do the elevator eyes thing.

(Ex. E, at 101:24-102:12)

> Q.     Okay. He looked your body up and down when he would
>        say these things?
>
> A.     Yes. Commented on my shoes and said that they were
>        distracting.
>
> Q.     When did he tell you that?
>
> A.     I don't remember when. I do remember what shoes they
>        were. They were high-heeled shoes, but not real high. They
>        were red, but like a muted almost maroon red. He  looked
>        down at my shoes and he said, man, those shoes are
>        distracting me.

(Ex. E, at 102:16-25)

15.     She further described the event in the car, referenced above, and testified:

---

[1] Plaintiff has presented no evidence that the Mayor directed Mr. Cortes to ask Plaintiff about Mr. Matz.

So Anna had another hearing scheduled, I believe it was a summary appeal. So she was going to stay at the courthouse and I went back with the mayor in the car. On the way back as we were walking to his car, people were stopping and shaking his hand and saying hello, Mr. Mayor.

Once we got passed those folks, he said to me, I just can't believe how everyone knows who I am. I said, well, you're the mayor. He just seemed shocked that the folks at the courthouse knew who he was and everyone was coming up to him. We broke off from folks and walked back to the car, got in the car.

As we were driving, he's like, man, I'm really -- he said he was nervous. He said, I'm really nervous. He's like, what if someone sees me with this beautiful woman in my car. He just acted kind of like a kid, a nervous kid.

(Ex. E, at 109:3-20)

16.     Plaintiff further alleged that the Mayor requested hugs from her:

Q.      How many times did the mayor ask or request a hug from you?

A.      I don't know how many, ten plus. It was during COVID. It was before COVID too, like I explained earlier, but during COVID. This was at a point where his behavior was different from in the beginning. In the beginning, it was very professional. Then over time, it changed.

I became more uncomfortable with him. So the hugs became more uncomfortable. It's not something that I ever saw him ask any other director of any other department can I have a hug.

(Ex. E, at 112:2-13)

17.     When asked if she ever saw the Mayor hug anyone else, she replied that the Mayor hugged other men in the office, and that while she did not see him hug any other women other than his wife, she conceded that the office was mostly men:

Q.      Did you ever see the mayor hug anyone else?

5

> A.    Yes, men, but they would do the kind of hug where they
>        put their hands out first and then pull in real quick and then
>        pat on the back. It was different. I don't know, the bro hug,
>        it's different.
>
> Q.    Well, how often would you see the mayor giving this,
>        quote-unquote, bro hug to other men?
>
> A.    With folks that he knew well, so his friends. He would do it
>        with Pedro. It wasn't really even a hug. It was a shake, pull
>        in, and a pat on the back sort of thing. He would do it with
>        Pedro because they were friends. Usually, other Latin men
>        who were friends.
>
> Q.    Did you ever see the mayor hug any other women besides
>        you?
>
> A.    No.
>
> Q.    You never saw him ever hug another woman?
>
> A.    Well, most of the people in city hall are men, at least the
>        people that I worked with in city hall. I think I might've
>        seen him hug his wife at one of the events; for instance, the
>        inauguration. Yes, I believe I saw him hug his wife. I
>        probably saw him hug her at his state of the city address,
>        the one year. There really aren't too many women there.

(Ex. E, at 112:14-113:17)

18.    She further testified that there were other occasions where she hugged other

people in the office, including friends:

> Q.    Have you ever hugged any city employees?
>
> A.    Amanda, I think I have hugged her. She's a personal friend.
>        As I mentioned before, when the administration first came
>        in and everyone was kind of in a congratulatory mood,
>        Pedro and the mayor. I don't recall any others. You know
>        what, yes, I may have at the end of the evening given a
>        friendly hug to Nathan Matz, but it was not real close or
>        lengthy in time. It was just a half goodbye hug because
>        we're close friends.

(Ex. E, at 216:22-217:7)

19.     Pedro Cortes, the former managing director for the City of Reading confirmed

that hugging was a cultural convention for the Mayor and many members of the staff.

Q.      Did you ever observe the Mayor hug Elizabeth Kraft?

A.      I would say embrace, yes, the Mayor would embrace Ms.
        Kraft and embrace me and embrace pretty much everybody
        else, as is the general customs, at least within the Latino
        culture where we are.

        And it is intended to be a sign of greeting, shake hands,
        hug, yes, it happened frequently among, you know, the city,
        among mostly the Latino community.

Q.      Sir, did you ever hug Ms. Kraft?

A.      I did, I did. In fact, she hugged me when we were
        reappointed back in early January 2020, when we met, and
        I think she was very comfortable and was aware that it was
        a way to express just a general greeting from perhaps the
        more traditional or informal just shaking of hands. It is very
        common to shake hands and have an embrace with no other
        intention, you know, just it is a greeting that is very
        common within the Latino community.

Q.      After that time when you saw her, got reacquainted, did
        you hug her during the course of your term?

A.      Very, very seldom. I believe that we did embrace or hug
        when I was leaving office and she was wishing me well, so
        yes. I pretty much hugged everybody on my way out as
        well.

(Cortes Dep., at Ex. F, at 57:22-59:2)

20.     Plaintiff testified that Mayor Moran invited her to visit Puerto Rico, which she

interpreted as an invitation to travel with him, in light of another comment by the Mayor, when

there may have been a residency-requirement issue for Plaintiff, that Plaintiff can come live in

the Mayor's finished basement:

Q.       If you can tell me as fully and completely as you can recall
         what did the mayor say during the phone call?

7

A.      Okay. So I answered the phone and he asked me where I was and I explained to him that I was on my way back from checking on the kids. He was aware that my kids were out of school and at home. He said, oh, well, that's going to make me feel really bad about what I'm going to say next because here you are a good mother, checking up on your children, and this makes it harder. Then he said that he was firing me. I was just shocked that he would say that. And then he said say that, oh, oh, I'm just kidding, I'm just kidding. Then he said, no, I'm really calling to ask you out on a date.

Q.      Did you say anything in response to that?

A.      I said, Mayor, you can't do that. It just came -- if I had thought about it more, I wouldn't have said anything, but it just involuntarily came out of my mouth, like, Mayor, you can't do that.

Q.      All right. Did he say anything?

A.      No. I mean, he went on with a question that he had for me. He wanted personal advice, legal advice, regarding his son.

Q.      Okay. What was the legal advice he was seeking?

A.      He wanted to set up a guardianship for his son. His son has autism and he was an adult at that point. He had just turned 18, I think.

Q.      Okay. Did you give him the legal advice or did you answer his question?

A.      I referred him to the firm that I used to work for...

Q.      Okay. Was anything said during this phone call?

A.      So we discussed that matter and then he went in to how his wife is in Puerto Rico and that she would be coming back. And when she would come back, then he would go to Puerto Rico. He didn't explain why.

        Then he said and you should come with me some time. No, he said you should come down with me and I can show you around the island. It's really, really beautiful. I said, I've heard it's very beautiful. He's like, yeah, and I can show

8

you where I grew up, you know, just stuff like that. He was talking about certain parts of where he grew up and that he wanted to take me there and show me.

* * *

Q.    I take it because it's in your complaint that you interpreted this as an actual invitation to go down to Puerto Rico together. Is that correct?

A.    I think that because of another conversation we had, plus that, yeah. I think if I said that I'd love to go, I don't know that he intended me to go on that trip, but eventually.

Q.    In other words, you don't believe he was simply saying that Puerto Rico is a beautiful island and that if you went down there, I can show you the best places or I can tell you about the best places to go?

A.    I don't believe that because of other comments that he made.

Q.    Okay. What are the other comments that he made that leads you to believe this was some type of sexual invitation or something along those lines?

A.    In a separate conversation around the same time, but I don't remember when, this was on the phone, I think it started out by we were talking about the residency requirement for Reading and that it was on the ballot. I said, yeah, I really don't know what I'm going to do if it doesn't pass.

Then he made a comment, well, you can come and stay at my house. He said that he has a finished basement and that me and the girls could come and stay with him. He even got into sort of like, oh, I can picture it now, I'll be looking out the window above the sink and watching you and the girls raking leaves. And then he was talking about you should come over some time, I have a fire pit, we'll sit by the fire.

And then he did mention about smoking marijuana. I found that -- that stood out to me because he has always said that he used to have a problem with alcohol and that he is very,

9

very strict about not drinking alcohol. So when he said that, I just thought I guess he still smokes pot.[2]

He also said, you know -- I was at home at the time when he called and he said something like, you know, I'm just picturing you now on the phone and wondering, like, what it looks like out your back window and your backyard and I want to see your backyard, which I found very bizarre. I don't know why, but I did it because

I didn't want him to hold it against me if I didn't. Then I also sent a picture of my front door because I had a pretty big political display. It was election season and I know we share similar political viewpoints. So just as like a funny ha-ha, I sent him a picture of the front door, like check this out.

I never pushed back with him directly, not with him, except for the one time when I exclaimed, Mayor, you can't do that. I just felt like I had to go along with it and not offend him.

(Ex. E, at 125:13-130:13)

> Q.   Again, I take it based on your testimony and your complaint, did you believe that what the mayor was saying to you about moving in and sitting out at the fire pit was some sort of sexual invitation?

> A.   I do. I think at the time he had made it clear to me that his wife was in Puerto Rico and he was home without her. He has spoken to me about her in the past. So he made it sound like he was happy that she wasn't there. So with that context, yeah, I think if I said how about tonight, let me come over, I don't think he would have declined.

(Ex. E, at 132:7-18)

21.    Further, in the Amended Complaint, Plaintiff discussed a phone call from Mayor Moran, in which he stated that if she needed anything from him, she only had to ask. It states:

---

[2] The Mayor denies this bizarre allegation, as he is a recovering alcoholic and has remained sober for many years. This assertion can be viewed as nothing other than a vain attempt by Plaintiff to slander Mayor Moran and his family as it fails to establish a cognizable claim against the City or him.

28. In or about December 2020, Moran called Plaintiff and told her if she needed anything from him, she just had to ask. And then he repeated it at least once, maybe twice. Plaintiff interpreted the comment, and its repetition, as a way of encouraging Plaintiff to ask for something so that he could condition it upon her granting of sexual favors.

(Ex. A, at ¶ 28)

22.     At her deposition, she testified:

Q.     You reference in your amended complaint a phone call in December of 2020 where the mayor told you that if you needed anything, you were just to ask or something to that effect. Do you remember that phone call?

A.     I do.

Q.     All right. Do you believe that him asking if you needed anything, do you believe that was harassing or discriminatory?

A.     I feel that it was intended -- I don't know what the intent of it was. I know the timing of it and I know the tone of his voice in that phone call and I know that it was very odd for him to call me and not have city business, but just to say, you know, if there's anything you need, you just have to ask.

Q.     Do you remember when in December of 2020 that he called you?

* * *

A.     The beginning of the conversation was, you know, how are you. Normal small talk; how are you doing, that kind of thing. It went for an extended period of time. So I kept waiting for him to get to the point, meaning the city business that he was calling about, and it wasn't coming. Then there were long pauses and it was just a very bizarre conversation where he said, you know, if you need anything, you just have to ask. I said, mayor, I'm fine, thank you for asking. He just sounded -- his tone was very serious, there were pauses. He didn't sound right, he didn't sound like his usual self.

11

> I was concerned that I had heard that he had a lot of things
> going on at the time from others in city hall who interact
> with him more than I do. So I was just like that was really
> strange and I sent him I think -- I don't know if it was a text
> or if it was in Messenger, but I sent him a reply and said,
> you know if you ever need anything or you need to talk. I
> forget exactly what I said, but I was a little concerned. It
> was just odd. He didn't sound right.

(Ex. E, at 137:9-139:15) [3]

23.     On September 28, 2020, Plaintiff sent a letter to the Mayor upon which she bases

her Pennsylvania Whistleblower Law Claims, in which a number of allegations were made.

(September 28, 2020 letter, at Ex. G.)

24.     In the Amended Complaint, Plaintiff described the alleged whistleblowing

activity as that she "reported to Moran instances of ghost employees, i.e., no-show employees

and employees not working full workweeks for which they were paid."  (Ex. A, at ¶58)

25.     However, in the September 28, 2020 letter, Plaintiff merely stated,

> Equal application of the City's 35-hour work week is in the best
> interest of City, ensures accountability, and respects all the City
> employees who show up to work every day no matter their
> circumstances. Therefore, I am advising that personnel policies be
> equally, fairly, and consistently applied to all City employees, **if**
> they are not already being so applied.

(Ex. G, at p.3)

26.     Second, in the complaint, Plaintiff alleges that she "cautioned Moran about his

usage of his city car for personal purposes, such as driving to New York to see family and

friends."  (Ex. A, at ¶59)

---

[3] This communication from the Mayor occurred during a time in which Plaintiff was experiencing serious personal family issues that the Defendants have taken great care to protect from public scrutiny.  Yet, Plaintiff has taken advantage of this protective behavior by suggesting that there was a discriminatory purpose behind the Mayor inquiring into Plaintiff's well-being and letting her know that he would provide assistance to her, if needed.

27.     However, in her September 28, 2020 letter, she merely stated that one of her "concerns" was "[u]se of the Mayor's city vehicle."  (Ex. G, at p.2)

28.     Mr. Cortes, for his part, testified that the only complaints about the use of the Mayor's city vehicle was in connection with him parking it in front of City Hall:

> Q.     And the third bullet on D 54 states use of the Mayor's city vehicle. Did Ms. Kraft ever verbally express any concerns to you about how the Mayor was using his city vehicle.
>
> A.     Again, here in our conversation in September the concerns as I recall had to do with others coming to Ms. Kraft and complaining or expressing concerns to the Mayor was exercising preferential use of his vehicle by parking the vehicle in front of City Hall as opposed to parking to which he is assigned, and that others felt that that was unfair because they had to walk to their parking spots elsewhere in the city.

(Ex. F, at 61:17-62:6.)

29.     Next, Plaintiff alleged in the Amended Complaint that she cautioned the Mayor about "city funds being paid to outside contractors for work they were not doing."  (Ex. A, at 60)

30.     However, in the September 28, 2020 letter, Plaintiff made no complaint about contractors being paid without doing work, instead she simply raised as a "concern" that "Invoices for services provided to the Mayor's office submitted without the proper documentation to support the charges listed. Several months have passed since requesting this documentation and repeated reminding, to no avail." (Ex. G, at p.2)

31.     Next, Plaintiff asserts in the Amended Complaint that she "cautioned Moran about his usage of city credit cards, and of usage by Moran's top aides."  (Ex. A, at ¶63)

32.     However, the September 28, 2020 letter, Plaintiff did not make any assertion that the credit card was being misused in any way; she merely raised a "concern" about the "[u]se of City credit card assigned to the Mayor."  (Ex. G, at p.2)

33.     Finally, in the Amended Complaint Plaintiff alleged that she reported:

> [T]hat members of the city's fire and police departments, and other high-ranking administration officials, were improperly exerting pressure on city officials to approve Heart and Lung Act benefits in particular cases. Such approvals, if improperly issued, could have wrongfully drained millions of taxpayer dollars from the city's self-insurance reserves. Improper pressure was also being exerted to accept certain Workers' Compensation claims that were previously denied as non-compensable.

(Ex. A, at ¶64)

34.     However, in the September 28, 2020 letter, Plaintiff merely asserts that she had "concerns" about "[m]eddling of Mayor's office staff in ongoing legal matters where there is counsel already assigned and potentially exposing the City to unnecessary liability."  (Ex. G, at p.2)

35.     Unlike other top staffer and department directors, Plaintiff, as the solicitor, had duties to both the Mayor and the city council, parties which are often at odds over policy.

> Q.     At the time that you were named acting solicitor under the Moran administration, what was, if any, the responsibilities and duties of the solicitor or acting solicitor with respect to city council?
>
> A.     We were to advise both the mayor and city council and provide them legal advice. That had not always been done in the past and, therefore, council was always a little leery of a solicitor that was coming in, a new one. When I served as acting under Wally Scott, I recognized that I also advise them and I was told by several members that they appreciated that.
>
> Q.     Did that change at all?
>
> A.     In what way?
>
> Q.     Well, in other words, was there any type of change in ordinance, charter, any type of official legal -- I'm being very vague here purposely, but any type of legal

14

> requirement that would allow council to appoint their own
> independent solicitor?
>
> A.    That happened after I was terminated. Wait, hold on. No, it
>       was on the ballot and it was approved in November. So
>       most of the time that I was solicitor, that was not the case.
>       In November, the ballot initiative was approved for council
>       to have the option of hiring their own counsel. But when
>       you would speak to the folks who put the initiative on the
>       ballot, it was for council to have the option. If you read the
>       language, it says council shall hire their own solicitor.

(Ex. E, at 59:7-60:13)

36.    Toward the end of 2020, Mayor Moran began to have doubts about Plaintiff's

ability to adequately perform her function, based on his own observations and those of other

staff.  In his answers to interrogatories, he stated:

> RESPONSE: Defendant, Eddie Moran, Mayor of City of Reading
> made the decision to terminate Plaintiff's employment. Mr. Moran
> made the decision, in part because of information communicated
> by and discussions with Pedro Cortes, former Managing Director
> for City of Reading, and Abe Amoros, Current Managing Director
> for City of Reading. In or around September 2020, Pedro Cortes
> communicated concerns regarding Plaintiff's work performance,
> including Plaintiff's failure to timely complete assignments and
> Plaintiff's frequent erratic behavior towards her colleagues and
> managing directors, to Mr. Moran. In or around December 2020,
> Abe Amoros expressed similar concerns regarding Plaintiff's
> performance, including Plaintiff's frequent absences from work, to
> Mr. Moran. Mr. Moran observed many of the performance issues
> and behavioral concerns that Mr. Cortes and Mr. Amoros had
> expressed to him. Mr. Moran made the decision to terminate
> Plaintiff's employment based upon his own observations of
> Plaintiff's performance and behavior and the concerns expressed
> by both Mr. Cortes and Mr. Amoros.
>
> Plaintiff was terminated because Plaintiff's prolonged failure to
> complete assignments in a timely manner, Plaintiff's difficulty
> maintaining productive and cooperative relationships with her
> colleagues and managing directors, and Plaintiff's frequent
> absences from work caused Mr. Moran and Plaintiff's managing
> directors to lose faith in Plaintiff's ability to perform in the role of
> City Solicitor.

(Answers to Interrogatories, at Ex. H, Interrog. No.1)

37.     Therefore, on February 23, 2021, Plaintiff's employment was terminated.  Her

termination letter from the Mayor read:

> Your employment as City Solicitor for the City of Reading is
> hereby immediately terminated. This difficult decision to terminate
> your employment has been made as a result of your ongoing
> difficulties in establishing and maintaining productive and
> harmonious working relationships with me and the City's
> Directors.

(Ex. B)

Respectfully submitted,

**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**

Dated:  <u>October 24, 2022</u>            By:_____

JOHN P. GONZALES, ESQUIRE
Attorney ID No. 71265
2000 Market Street, Suite 2300
Philadelphia, PA 19103
P: (215) 575-2871/
F: (215) 575- 0856
E-mail:  jpgonzales@mdwcg.com
*Attorney for Defendants, City of
Reading and Mayor Eddie Moran*

16

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| A. ELIZABETH KRAFT, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: 5:21-CV-5430 |
| | : | |
| vs. | : | |
| | : | **JURY TRIAL DEMAND** |
| CITY OF READING and MAYOR EDDIE | : | |
| MORAN (in his individual capacity only) | : | |
| Defendants. | : | |

## <u>CERTIFICATE OF SERVICE</u>

I, JOHN P. GONZALES, ESQUIRE, do hereby certify that on the date listed below, I caused a true and correct copy of Defendants' Motion for Summary Judgment, Statement of Undisputed Facts, Memorandum of Law and proposed Order was electronically filed with the Court, and is available for viewing and downloading from the ECF System.

> **MARSHALL DENNEHEY WARNER
> COLEMAN & GOGGIN**

Dated: <u>October 24, 2022</u>

By:_____

JOHN P. GONZALES, ESQUIRE
Attorney ID No. 71265
2000 Market Street, Suite 2300
Philadelphia, PA 19103
P: (215) 575-2871/
F: (215) 575- 0856
E-mail:  jpgonzales@mdwcg.com
*Attorney for Defendants, City of
Reading and Mayor Eddie Moran*